UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FIRESTAR DIAMOND, INC., <br><br>         Debtor, | |
| BANK OF INDIA, *Bharat Diamond Bourse Branch*, <br><br>         Appellant, <br><br> -against- <br><br> RICHARD LEVIN *as liquidating Trustee of the Firestar Diamond Liquidating Trust*, <br><br>         Appellee. | Case No. 1:22-cv-08718 (JLR) |
| BANK OF INDIA (LONDON BRANCH), UNION BANK OF INDIA (UK) LTD., and RECEIVERS OF FIRESTAR DIAMOND BVBA, <br><br>         Appellants, <br><br> -against- <br><br> RICHARD LEVIN *as liquidating Trustee of the Firestar Diamond Liquidating Trust*, <br><br>         Appellee. | Case No. 1:22-cv-08729 (JLR) <br><br><br><br><br><br> **OPINION AND ORDER <br> AFFIRMING ORDER OF <br> BANKRUPTCY COURT** |

JENNIFER L. ROCHON, United States District Judge:

       This appeal arises out of claims filed against the bankruptcy estate of the jewelry wholesaler Firestar Diamond, Inc. ("FDI"). Specifically, four banks – the Bank of India (London Branch) ("BOI-L"), Receivers of Firestar Diamond BVBA on behalf of the Bank of India (Antwerp Branch) ("BOI-A"), Union Bank of India (UK) Ltd. ("UBI"), and Bank of India, Bharat Diamond Bourse Branch ("BOI-B" and, together, the "Banks") – appeal an order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") disallowing their claims against FDI. *See In re Firestar Diamond, Inc.*, 643 B.R. 528 (Bankr. S.D.N.Y. 2022) ("*Firestar III*"). For the reasons explained below, the

order of the Bankruptcy Court is AFFIRMED.

## BACKGROUND

The following facts are drawn from the Appellant's Appendix ("App.") (ECF No. 11 in Case No. 22-cv-08718) designating the bankruptcy record in connection with this appeal and are undisputed unless noted otherwise.[1]

### I.    Chapter 11 Proceedings

FDI operated as a jewelry wholesaler based in New York.  App. at 2104.  With two other corporations – A. Jaffe, Inc. and Fantasy, Inc. (together with FDI, the "Debtors") – FDI was part of an international diamond and jewelry business owned and controlled by Nirav Modi, the majority shareholder of FDI's parent company.  *Id.* at 928; *see id.* at 2076, 2104-09.

In January 2018, Punjab National Bank ("PNB") filed a criminal complaint alleging "the largest bank fraud in Indian history," in which Modi and his co-conspirators purportedly used fraudulently obtained Letters of Understanding ("LOUs") to borrow billions of dollars from PNB and other banks.  *Id.* at 928; *see id.* at 2080.  According to Indian authorities, Modi used a series of entities that posed as independent third parties in sham transactions to import gemstones and other types of jewelry to obtain approximately $4 billion from PNB through fraudulently issued LOUs.  *Id.* at 928-29.

Facing asset seizures and the arrest of several employees, the Debtors sought relief under Chapter 11 of the Bankruptcy Code on February 26, 2018.  *Id.* at 2079, 2081; *see id.* at 1825-29.  Amid concerns that the Debtors might have been involved with the alleged fraud, the Bankruptcy Court appointed an examiner, who found substantial evidence of the Debtors' knowledge of and involvement with the alleged fraud.  *Id.* at 2072, 2082-83; *see id.* at 1856.

---

[1] Unless otherwise noted, the Court's ECF citations refer to Case No. 22-cv-08718.

Against this backdrop, the Bankruptcy Court appointed Richard Levin (the "Trustee") as the Chapter 11 trustee in June 2018, and the Trustee has administered the Debtors' estates since that time. *Id.* at 929; *see id.* at 1909. Once the Bankruptcy Court confirmed a Chapter 11 liquidation plan in 2020, Levin was appointed as the Liquidating Trustee and vested with all of the Chapter 11 Trustee's rights and defenses as to disputed claims. *Id.* at 929.

## II.     Underlying Transactions

The Banks' claims against FDI stem from FDI's purchase of diamonds from three of its affiliates: Firestar Diamond International Private Limited ("FDIPL"), Firestar Diamond BVBA ("BVBA"), and Firestar Diamond FZE ("FZE" and, together, the "Affiliates"). *See id.* at 62-73, 124-79, 199-238, 259-87 (the Banks' proofs of claim). In connection with these transactions, the Banks provided funds to the Affiliates for the time between the Affiliates' shipment of goods to FDI and FDI's eventual payment. ECF No. 12 ("Appellants' Br.") at 4. This post-shipment financing generally operated as follows: After each sale of diamonds, the Affiliates sent FDI an invoice stating that payment was due between 120 and 150 days from the date of shipment and instructing FDI to pay the Banks directly for the ultimate benefit of the applicable Affiliate. *See, e.g.*, App. at 1615, 1634, 1637, 1639-40. The Affiliates would inform the Banks of the sale and draw funds under a set of standing credit agreements. *See, e.g.*, *id.* at 1099, 1624. As security for each draw from their credit facilities, the Affiliates pledged the underlying invoices and their accounts receivable to the Banks. *Id.* at 1624. Upon releasing funds to the Affiliates in connection with each sale, the Banks would send the invoice, along with the relevant shipping documents for each sale, to FDI. *Id.* at 1625, 1638. If FDI's payments to the Banks exceeded the amounts drawn by the Affiliates, the Banks would remit the excess to the Affiliates. *See, e.g.*, *id.* at 1630 (BOI-A "would remit any funds

to BVBA only if the transfer from FDI covered more than the sum BVBA had drawn" (emphasis omitted)).

In several transactions preceding those at issue here, the Affiliates sold FDI diamonds and received financing from the Banks under the same credit facilities.  *Id.* at 1628-30.  After receiving full payment from FDI for those transactions, the Banks credited the Affiliates' accounts and remitted any excess funds.  *Id.* at 1630.  However, at various points in 2017, the Affiliates drew funds on credit from the Banks in connection with several invoices issued to FDI that remain unpaid.  These invoices, which the Court details below, form the basis for the Banks' claims at issue here.

### A. FZE and Bank of India (London Branch)

BOI-L's claim stems from one sale of diamonds by FZE to FDI.  BOI-L provided a credit facility to FZE under a "Facility Agreement" dated July 2, 2012, *id.* at 496-532, amended and restated on July 31, 2013, *id.* at 534-81, and renewed on April 12, 2016, *id.* at 583-84; *see id.* at 934.  For any sale to FDI, FZE could draw up to 70 percent of the sale price as stated in the commercial invoice, up to $15 million.  *See id.* at 583, 1031, 1628  As security for the credit extended under this agreement, FZE executed a deed of hypothecation pledging to BOI-L "all the tangible and intangible assets of" FZE.  *Id.* at 586; *see id.* at 1030 (BOI-L describing deed of hypothecation as granting "a right of pledge over all Receivables of FZE").

On November 8, 2017, FZE sold cut and polished diamonds to FDI for $367,124.60. *See id.* at 1033.  FZE's invoice, generated that day, gave FDI 150 days to make payment and requested "Payment to be made Directly to" BOI-L, with FZE listed as the "Ultimate Beneficiary."  *Id.* at 1095.  On November 9, 2017, FZE initiated the "pledge" of the invoice to BOI-L and sent a letter of exchange to FDI directing payment to BOI-L.  *Id.* at 1097-98, 1634. On November 11, 2017, FZE sent notice to BOI-L of the sale and its drawing of funds under

the credit facility. *Id.* at 1099. In that letter, FZE authorized the debit of its account for the "necessary charges" involved in handling the collection on the bill. *Id.*; *see id.* at 1634. On November 21, 2017, BOI-L issued notice to FDI's bank of the transaction, with instructions for payment. *Id.* at 1100, 1634. FDI's bank acknowledged on November 30, 2017 that the "draft was accepted by" FDI. *Id.* at 1101 (capitalization omitted). BOI-L subsequently released $256,000 (70 percent of the invoice) to FZE. *Id.* at 1635. By the time payment was due on the invoice on April 8, 2018, the Debtors had initiated bankruptcy proceedings.

**B. BVBA and Bank of India (Antwerp Branch)**

BOI-A's claim arises from three sales of diamonds by BVBA to FDI. BOI-A provided a credit facility to BVBA, documented in a series of "Sanction of Credit Line" letters that were renewed annually. *See id.* at 415-43 (last renewed on January 30, 2017). For each sale to FDI, BVBA could draw funds on the credit facility up to 80 percent of the relevant invoice. *Id.* at 1628-29. Each letter incorporated BOI-A's general conditions for extending credit, which state in relevant part that, "[a]s security for its obligations, the Borrower shall pledge to the Bank all its present and future receivables from third parties, including, but not limited to, bills, claims, [and] contracts, . . . and it shall authorize the Bank to comply with the formalities necessary to render such pledge enforceable vis-à-vis third parties." *Id.* at 995; *see, e.g.*, *id.* at 425 ("All such bills/invoices submitted to us for the purpose of drawing limit/cover shall be specifically pledged/assigned in our favour as mentioned in Article 16 of the 'General Conditions' and shall contain a clause mentioning that payment must be made to your account in our books only.").

On August 16, September 6, and November 10, 2017, BVBA sold polished diamonds to FDI. *Id.* at 1020, 1023, 1026 (invoices); *see id.* at 1636-37. On the invoices for each of these transactions, BVBA directed FDI to pay BOI-A, "in whose favour [BVBA] endorse[d]

5

this invoice, by way of pledge." *Id.* at 1020, 1023, 1026.  The invoices included an additional

notation that this payment was for the "ultimate credit" of BVBA.  *Id.* (capitalization omitted).

Each invoice set a payment due date for approximately 150 days out.  *See id.*  In connection

with these sales to FDI, BVBA sought to draw additional funds on its credit agreement with

BOI-A.  *Id.* at 1636.  BVBA submitted each invoice to BOI-A, which transmitted them and

proof of shipment to FDI; FDI accepted the invoices without objection.  *Id.* at 1637-38.

### C.  BVBA and Union Bank of India

UBI's claim arises from three additional sales of diamonds by BVBA to FDI.  Under a

"Pledge of Receivables Agreement" dated October 16, 2014, UBI "granted to [BVBA] an on

demand invoice discounting facility in the maximum principal amount of USD 9,000,000."

*Id.* at 363.  As security for the credit extended under the agreement, BVBA "grant[ed] to

[UBI] a right of pledge . . . over all Receivables."  *Id.* at 364.  Although the pledge agreement

permitted BVBA to collect its own receivables, it also granted UBI the right to collect on the

invoices as BVBA's agent.  *Id.* at 365, 369.

On October 6, November 10, and November 29, 2017, BVBA sold polished diamonds

to FDI.  *Id.* at 1639-40.  Like BVBA's other invoices, the invoices for these sales directed FDI

to pay "to the credit of" UBI, but noted that payment was for "further credit to" BVBA.  *Id.* at

1133, 1136, 1140.  Payment of each invoice was due approximately in 120 days.  *Id.*  BVBA

submitted the invoices to UBI for transmittal to FDI.  *Id.* at 1640.

### D.  FDIPL and Bank of India (Bourse Diamond Branch)

BOI-B's claim arises from several sales of diamonds by FDIPL to FDI between

September 15, 2017, and December 15, 2017.  FDIPL entered into a "Consortium

Arrangement of Working Capital Facilities" with a consortium of Indian banks, of which

BOI-B is a member.  *See id.* at 1220-1485.  This arrangement operated much like those

between the other Affiliates and Banks.  "As security for the repayment of" any funds drawn under the agreement "together with interest, costs, charges[,] and other expenses," FDIPL "created/extended or agreed to create/extend . . . for the benefit of the said Banks securities . . . by way of hypothecation of the entire current assets of [FDIPL], including, but not limited to, [FDIPL's] . . . bills, receivables[,] and book debts, both present and future."  *Id.* at 1227-28.

Either FDI or its bank was presented with the invoices at issue here, which each directed FDI to pay BOI-B with "further credit to [the account of FDIPL] with [BOI-B]."  *Id.* at 129-31, 137-40, 152, 162-66, 171, 176; *see id.* at 1615-18.  Payment on the invoices was due 150 days after each invoice.  *Id.* at 129-31, 137-40, 152, 162-66, 171, 176.  FDIPL granted BOI-B the right to collect on the invoices as its agent.  *Id.* at 1612; *see id.* at 1275 ("[FDIPL] irrevocably constitutes and appoints Security Trustee and each of the said Banks to be [FDIPL]'s true and lawful attorney(s) to do and execute jointly or severally for and in the name and on behalf of [FDIPL]," among other things, "demand and receive all debts, sums of money, principal money, dividends, interest[,] and dues of whatever nature.").  FDI stamped two of the invoices in question as "accepted."  *Id.* at 1488 (capitalization omitted); *see id.* at 1616 ("[BOI-B] provided to [FDI], and [FDI] accepted, a draft exchange demand for the sum of these first two invoices to be paid to [BOI-B] via [FDI's bank]." (emphasis omitted)).  FDIPL requested, and received, post-shipment financing based on several of these transactions.  *Id.* at 1178, 1191, 1198; *see id.* at 1613.

## III.   Procedural History

The Trustee filed objections to the Banks' proofs of claim, arguing that the Affiliates' alleged complicity in the fraud voided any claims derived from the Affiliates.  *Id.* at 51-61, 114-23, 189-98, 248-58.  In particular, the Trustee argued that, under 11 U.S.C. § 502(d)

("Section 502(d)"), the Banks' claims were barred because they had been transferred to the Banks by subsidiaries of the Debtors that had failed to pay back millions of dollars received through the underlying bank-fraud scheme. *See In re Firestar Diamond, Inc.*, 615 B.R. 161, 164 (Bankr. S.D.N.Y. 2020) ("*Firestar I*"), *vacated and remanded*, 627 B.R. 804 (S.D.N.Y. 2021) ("*Firestar II*"). The Bankruptcy Court granted the Trustee's objections, holding that "claims that are disallowable under Section 502(d) must be disallowed no matter who holds them." *Id.* at 167 (brackets omitted) (quoting *In re KB Toys Inc.*, 736 F.3d 247, 252 (3d Cir. 2013)); *see id.* at 168 ("Section 502 follows the claim, not the claimant."). The Bankruptcy Court disallowed the claims, finding that they were based on the Debtors' dealings with the Affiliates and therefore disallowable as they would be if the Affiliates had filed them. *See id.* at 169.

On appeal, Judge Koeltl agreed with the Bankruptcy Court's conclusion that "a transferee of a claim is subject to the same burdens under Section 502(d) as the transferor." *Firestar II*, 627 B.R. at 808. However, Judge Koeltl noted that the Bankruptcy Court "made no specific findings as to what exactly the Banks received from the Affiliates and how they received it." *Id.* at 809. To determine whether the claims were transferred and therefore disallowable under Section 502(d), Judge Koeltl remanded the case for the Bankruptcy Court to make further factual findings as to the "characterization of the Banks' claims and how they are allegedly traced – or not traced – to claims by the Affiliates against Firestar." *Id.*

On remand, the Bankruptcy Court again disallowed the Banks' claims. *Firestar III*, 643 B.R. at 555. It determined that "the language of the parties' agreements, as well as the admissions of the Banks' representatives, establish that [the agreements] created pledges of accounts receivable between the various Affiliates and Banks and, therefore, the claims here

belong to the Affiliates, not the Banks." *Id.* at 543.[2]  Finding that the "Banks are only lenders

to and collection agents for the Affiliates," which "retained the ultimate responsibility to

repay these loans under the agreements," the Bankruptcy Court rejected the Banks'

characterization of the parties' agreements as "independent, contractual obligations owed by

FDI to the Banks." *Id.* at 547.  The Bankruptcy Court held that the Affiliates' pledges of

accounts receivables "fit[] the broad definition of transfer under Section 101(54) of the

Bankruptcy Code." *Id.* at 555.  Because the claims at issue were transferred for Section

502(d) purposes from the Affiliates to the Banks, the Bankruptcy Court deemed them

disallowable. *Id.*  The Banks timely appealed to the undersigned.

## LEGAL STANDARD

The district court has jurisdiction to hear appeals from final orders of the bankruptcy

court, including orders disallowing claims.  28 U.S.C. § 158(a)(1); *see Morse v. Rescap*

*Borrower Claims Tr.*, No. 14-cv-05800 (GHW), 2015 WL 353931, at *3 (S.D.N.Y. Jan. 26,

2015), *aff'd*, 628 F. App'x 63 (2d Cir. 2016) (summary order); *In re Kassover*, 268 B.R. 698,

699 (S.D.N.Y. 2001), *aff'd sub nom. Kassover v. Gibson*, 29 F. App'x 747 (2d Cir. 2002)

(summary order).  In reviewing such judgments, the district court functions as an appellate

court.  *See Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 448-

49 (2d Cir. 2008).  Thus, the district court reviews *de novo* conclusions of law and reviews

findings of fact for clear error.  *Id.* at 449; *accord DuVall v. County of Ontario*, 83 F.4th 147,

150 (2d Cir. 2023).  A finding of fact is clearly erroneous only if this Court is "left with the

---

[2] To pledge accounts receivable is to post them as collateral for a loan while retaining
ownership of those assets. *See Pledge*, Black's Law Dictionary (11th ed. 2019) ("Both in a
pledge and in a lien the general property remains in the debtor and the creditor has only a
special property." (citation omitted)).  By contrast, a factoring arrangement generally
"involves the *sale* of accounts receivable at a discounted price."  *Nickey Gregory Co. v.
AgriCap, LLC*, 597 F.3d 591, 601 (4th Cir. 2010).

definite and firm conviction that a mistake has been committed." *Adler v. Lehman Bros. Holdings Inc.* (*In re Lehman Bros. 3 Holdings Inc.*), 855 F.3d 459, 469 (2d Cir. 2017) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Although the bankruptcy court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden. *H & C Dev. Grp., Inc. v. Miner* (*In re Miner*), 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999).

## DISCUSSION

### I.   Applicable Legal Standards

Under Section 502(d) of the Bankruptcy Code, a bankruptcy claim is subject to disallowance if the claimant receives property that is recoverable by the bankruptcy estate. Section 502(d) provides that:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). Therefore, the Bankruptcy Code "requires a court to disallow an entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity . . . but that entity has failed to first transfer this property back to the bankruptcy estate." *U.S. Lines (S.A.), Inc. v. United States* (*In re McLean Indus., Inc.*), 30 F.3d 385, 388 (2d Cir. 1994); *see In re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005) ("[T]he purpose of § 502(d) is to preclude entities that have received voidable transfers from sharing in the distribution of assets unless or until the voidable transfer has been returned to the estate." (quotation marks and citation omitted)). "[A] transferee of a claim is subject to disallowance under Section 502(d) on par with the transferor." *Firestar II*, 627 B.R. at 808.

## II.     The Bankruptcy Court Correctly Characterized the Underlying Transactions

The parties do not dispute that any claims of the Affiliates against FDI are disallowable under Section 502(d) because the Affiliates have not returned to FDI any voidable transfers or preferences that they received.  *Id.* at 807; *see* ECF No. 13 at 7.  Instead, the dispute centers around whether the Banks' claims against FDI are transfers from the Affiliates or independent contractual obligations owed by FDI to the Banks.

### A.  The Affiliates Pledged Their Accounts Receivable as Collateral

The Court adopts the thorough and well-reasoned analysis of the Bankruptcy Court, which characterized the transactions at issue as pledges of the Affiliates' accounts receivable to the Banks.  As a threshold matter, the Banks dispute the relevance of *AgriCap*, 597 F.3d 591, and *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) – on which the Bankruptcy Court relied to construe the meaning of the relevant agreements – and seek to distinguish those cases as decided under a different statute, *see* Appellants' Br. at 28; *Firestar III*, 643 B.R. at 544.  As the Bankruptcy Court acknowledged, that statute's protections are "not applicable to this case."  *Firestar III*, 643 B.R. at 544.  Nonetheless, this Court agrees with the Bankruptcy Court that the discussions in *AgriCap* and *Endico Potatoes* as to whether the accounts receivable were sold or pledged as collateral for secured loans are relevant to the issues raised here.  *See id.* at 544-47; *AgriCap*, 597 F.3d at 599-603 (concluding that a line of credit geared to the amount of a debtor's accounts receivable was a loan, not a sale); *Endico Potatoes*, 67 F.3d at 1068 (deciding whether an assignment of accounts receivable from a borrower to a lender, together with the lender's loan advances to the borrower, constituted a purchase for value or "no more than a security interest").  Considering the "strikingly similar" agreements in *AgriCap* and the factors described in *Endico Potato*, the Court shares the Bankruptcy Court's conclusion that the Banks were

lenders and collection agents who hold security interests in the Affiliates' accounts receivable as collateral for the repayment of the Banks' loans to the Affiliates, not purchasers of the Affiliates' accounts receivable who assumed the ultimate risk of collecting on the receivables. *Firestar III*, 643 B.R. at 544-46.

The Banks disagree that the Affiliates bore the primary risk of FDI's non-payment. The Banks argue that they directly assumed the risk of FDI's payment and maintained the ability to pursue the Affiliates as guarantors of the Debtor's obligation through the Banks' security interest.  Appellants' Br. at 28-29.  But, as the Bankruptcy Court noted, the instruction on the invoices for FDI to pay the Banks directly had no effect on the Affiliates' credit balances with the Banks; the Banks could demand payment from the Affiliates for the entire outstanding loan balance; and "in the event that the Affiliates paid all outstanding obligations to the Banks, the Banks would no longer hold an interest in the Affiliates' outstanding accounts receivable."  *Firestar III*, 643 B.R. at 546 (brackets and citation omitted).  The Banks do not dispute any of these factual findings.  That each Bank had to approve the Affiliates' customers before extending credit for transactions with them does not upset the Court's conclusion that the Affiliates continued to bear the risk of FDI's non-payment and remained ultimately liable for the debt.  *Cf.* Appellants' Br. at 29.[3]

---

[3] In their reply brief, the Banks challenge several of the Bankruptcy Court's factual findings as "unsupported."  Appellants' Reply at 20.  This assertion misrepresents the Bankruptcy Court's opinion.  In concluding that the invoices "direct payment to the Banks with the balance to be remitted to the Affiliates," *Firestar III*, 643 B.R. at 545, the Bankruptcy Court referenced its earlier finding that the Banks remitted excess payments to the Affiliates, *id.* at 537 & n.25.  The Bankruptcy Court similarly cited support for its holding that the Affiliates were ultimately responsible for repaying their loans.  *See id.* at 546.  That some of the Banks' branch managers testified as to how the financing arrangements between the Affiliates and the Banks also benefitted FDI does not undermine that conclusion.  Appellants' Reply at 20.

These transactions, by which the Affiliates pledged their accounts receivable as collateral for the repayment of the Banks' loans, are plainly "transfers" under Section 502(d). Under the Bankruptcy Code, a "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). The Affiliates' receivables against FDI were property; when the Affiliates gave the Banks a security interest in those receivables, they disposed of or parted with an interest in their property. *See Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*), 469 B.R. 415, 440 (Bankr. S.D.N.Y. 2012) ("[C]ourts uniformly have treated a pledge . . . of a security interest as a 'transfer' of an interest in property."). Because the Affiliates have not returned to FDI all property that is recoverable by the bankruptcy estate, their transferred claims are disallowable under Section 502(d). *See McLean*, 30 F.3d at 388; *Firestar II*, 627 B.R. at 808.

The Banks respond that the payments due under the invoices were not claims transferred from the Affiliates, but rather new obligations owed by FDI. Appellants' Br. at 24. As the Court explains below, the Bankruptcy Court found no evidence in the record to support this characterization of the transactions. Rather, the Banks' credit facilities gave the Banks claims against the Affiliates, claims that were secured by security interests in the accounts receivable and the right to collect the invoices as an agent for the Affiliates. To the extent that the Banks have claims against FDI for payment on the invoices, they are derivative of their claims against the Affiliates. The Banks misconstrue their relationship with FDI by citing to inapposite cases. *See id.* at 24-25 (citing *Geltzer v. Mooney* (*In re MacMenamin's Grill Ltd.*), 450 B.R. 414, 428-29 (Bankr. S.D.N.Y. 2011); *Buchwald Cap. Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 447 B.R. 170, 189 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013)

(summary order); *Asia Glob. Crossing*, 333 B.R. at 202-03; *Covey v. Com. Nat'l Bank of Peoria*, 960 F.2d 657, 661 (7th Cir. 1992)).  In each of these cases, the bankrupt debtor was the direct borrower, not, as here, the account debtor of the borrower.  *See MacMenamin's Grill*, 450 B.R. at 417 (relevant loan obligation was between lender and debtor); *Fabrikant*, 447 B.R. at 189 (lending banks advanced proceeds under lines of credit to debtors); *Asia Glob. Crossing*, 333 B.R. at 201 (concerning guaranty agreement between debtor and creditor-claimant).  Therefore, they feature comparatively straightforward transactions where a creditor lends directly to a borrower and do not address whether a borrower's claims against a third party were transferred to the lender.  None of these cases supports the Banks' assertion that, by providing loans to the Affiliates that contemplated extended payment terms, the Banks provided value to FDI in consideration of a direct right to payment against FDI.

The Banks further contend that the transactions could not have amounted to "transfers" of an interest in property because the Banks "already held liens on all accounts receivable of the respective Affiliates, both present and future, and thus already were the secured creditors of the Affiliates long before the sales of the diamonds at issue occurred." Appellants' Br. at 27.  The Banks argue that they must have acquired more than security interests against the Affiliates; otherwise, they would have received no consideration for the transactions.  *Id.*  However, the undisputed facts establish adequate consideration for the agreements that governed the transactions at issue.  Each Affiliate received a revolving line of credit in exchange for its promise to remit payments to one of the Banks and to grant that Bank a security interest in its accounts receivable.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10-cv-01762 (RER), 2013 WL 696651, at *2, *7 (E.D.N.Y. Feb. 26, 2013) (finding consideration for credit agreement where the debtor assigned the creditor a

continuing security interest in collateral that included all the debtor's future accounts receivable).[4]

Finally, the Banks argue that their claims do not fall within the plain language of Section 502(d) because they received no property from FDI that they can return. Appellants' Br. at 17, 29-31.  But the Bankruptcy Court did not suggest that the claims were disallowable because the Banks received avoidable property.  Instead, it held that "Section 502 follows the claim, not the claimant."  *Firestar I*, 615 B.R. at 168.  That the Banks received no avoidable property that they failed to return to FDI is irrelevant to the Court's analysis.

### B.  The Transactions Did Not Create Direct Obligations from FDI to the Banks

Although the Banks do not deny that the Affiliates pledged their account receivables to the Banks as collateral for the repayment of the Banks' loans, they contend that, through these agreements, they *also* acquired a right to direct payment from FDI on the invoices and that FDI likewise incurred and accepted independent obligations to the Banks to pay those invoices.  *See* Appellants' Br. at 4 ("[T]he Bank Appellants extended funding to the Affiliate[s] in the form of seller financing or acquired the rights to payment of the affiliates' sale invoices to FDI."); ECF No. 14 ("Appellants' Reply") at 10-12.  To justify this characterization, the Banks assert that they, the Affiliates, and FDI "entered into a series of tripartite transactions supported by mutual consideration."  Appellants' Br. at 2.  In their view, the mutual consideration consisted of the Banks' "extension of seller financing to the Affiliates," the Affiliates' sale of diamonds to FDI under extended payment terms and the direction for FDI to make payment on those sales to the Banks, and FDI's payment for the

---

[4] The Banks appear to have charged interest on the credit extended, which would also constitute consideration for each transaction.  *See, e.g.*, App. at 1035 (before remitting excess funds paid by FDI, BOI-L would have deducted the amount already drawn by FZE, "plus interest in the amount of USD 4,924.04").

diamonds.  *Id.* at 32; *see id.* at 37 (describing the mutual consideration as "the Banks'
providing the funding to cover the lag between shipment and payment date, the Affiliates
supplying the product, and FDI ultimately paying for the goods").  The Banks contend that,
because these agreements originated between all the parties rather than just between the Banks
and the Affiliates, the transactions created independent contractual obligations owed directly
by FDI to the Banks.

The Bankruptcy Court squarely rejected this framing, finding no evidence to support
the Banks' characterization of the transactions as tripartite agreements.  *See Firestar III*, 643
B.R. at 548-54.  As it explained:

> The Affiliates . . . issued invoices to FDI, directing FDI to make
> payments directly to the Banks.  Although FDI concedes that it
> accepted the invoices from the Affiliates and agreed to pay
> under the invoices, there is no evidence in the record that FDI
> knowingly accepted the risk of nonpayment on loans that the
> Affiliates owed to the Banks or that there was any meeting of
> the minds between FDI and the Banks.  Indeed, the Banks only
> became aware of the Affiliates' sales to FDI after the Affiliates
> forwarded the invoices and proof of shipment of the goods to
> FDI.  Thus, based on this timing, the Trustee rightly contends
> that the Banks were not parties to these sale transactions and
> could not have been extending value to FDI by providing
> extended payment terms on deals of which the Banks were
> unaware.  This is particularly true given that the Affiliates were
> not obligated to even seek financing from the Banks after
> making a sale to FDI.

*Id.* at 549 (citations omitted).  The Bankruptcy Court also addressed the Banks' "mutual
consideration" argument, finding "no indication on the invoices . . . that the 120 to 152 days
that the Affiliates gave FDI to pay was actually an offer extended by the Banks.  Nor is there
any indication in the record that FDI understood this extended period of time to be
consideration in exchange for anything."  *Id.* at 550.

The cases cited by the Banks are unavailing.  *See* Appellants' Br. at 33-35 (citing *DeSimon v. Ogden Assocs.*, 454 N.Y.S.2d 721 (2d Dep't 1982); *O'Brien v. Grant*, 40 N.E. 871 (N.Y. 1895); and *United States v. Tilleraas*, 709 F.2d 1088, 1091 (6th Cir. 1983)).  These cases stand merely for the proposition that tripartite contracts may exist in contexts vastly different from the one presented here.  *See DeSimon*, 454 N.Y.S.2d at 482 (tripartite contract for sale of property among co-op sponsor, tenants, and corporation where the sponsor capitalized the corporation with real property, the corporation issued stock to the tenants, and the "tenants issued notes to the sponsor as the necessary inducement for the sponsor's capitalization of the corporation"); *O'Brien*, 40 N.E. at 873 (tripartite agreement among two banks and a clearinghouse); *Tilleraas*, 709 F.2d at 1091 (finding "a kind of tripartite relationship" among debtor, creditor, and surety where the surety promised to assume responsibility for repayment of a debt in the event of the borrower's default, done "to induce the creditor to deal with the borrower where there might otherwise be a reluctance to do so").  They do not support the Banks' assertion that a lender's loan to a seller – simply because it contemplates extended payment terms on the underlying sale of goods – sufficiently benefits a buyer not otherwise privy to the loan so as to independently bind that buyer to the lender.  *See* Appellants' Br. at 33 (arguing that the "Bankruptcy Court downplayed the direct benefit that inured to FDI through these tripartite transactions, most prominently the extended [terms of] payment").  And insofar as the extra time for FDI to pay for its purchases constituted a benefit, let alone consideration, Appellants' Reply at 16, it came from the Affiliates, not the Banks, *see* Appellants' Br. at 32.[5]

---

[5] Elsewhere, the Banks characterize the extended-payment terms as consideration provided by the Banks.  *See* Appellants' Reply at 15-17; App. at 1655 (Banks suggesting in their reply brief to the Bankruptcy Court that *they* granted the extended-payment terms to FDI).  They offer no support for this assertion.

The Banks further contend that New York courts have recognized enforceable obligations from a buyer to the seller's lender in similar transactions. *See id.* at 35-37 (citing *Worthy Lending LLC v. New Style Contractors, Inc.*, 201 N.E.3d 783 (N.Y. 2022); and *State Bank of India v. Shane of N.Y., Inc.*, No. 12-cv-08916 (DEW) (S.D.N.Y. Nov. 7, 2014), ECF No. 44). Both cases, however, cut against the Banks' position.

*Worthy Lending* involved a creditor who, as the secured lender of a commercial seller in default, sought to recover – directly from a customer of the seller – all amounts owed by that customer to the seller. 201 N.E.3d at 785. The New York Court of Appeals held that the applicable agreement "grant[ed] [the lender] the right to direct [the seller's] debtors to pay [the lender] directly," such that the lender could "obtain collateral directly from" the customer. *Id.* at 786. Although *Worthy Lending* supports the notion that a secured lender can acquire enforceable obligations against a seller's account debtor, it also suggests that those obligations derive from the seller. *See id.* at 787 (emphasizing that the lender's "security interest is treated as an assignment"). Missing from *Worthy Lending* is anything to suggest that creditors like the Banks have a new, independent right to payment against a seller's account debtor by dint of their security interests in the assets of the seller.

*State Bank of India* turned on a similar analysis, which the Bankruptcy Court noted in its opinion on remand from Judge Koeltl. *See Firestar III*, 643 B.R. at 551. There, a seller of diamonds entered into a credit agreement with the State Bank of India, sold diamonds to the purchasers, and issued two invoices to the purchasers based on these sales. *State Bank of India*, slip op. at 1. As in this case, the invoices directed the purchaser to pay the bank directly, rather than the seller. *See id.* at 3. The court found that the amounts due on the invoices had created an otherwise valid assignment from the seller to the bank – such that the bank held a right of recovery against the purchaser of the diamonds – but for the bank's

violation of terms under the assignment.  *Id.* at 3-4.  As the Bankruptcy Court explained, *State Bank of India* suggests that the Affiliates assigned their claims to the Banks, rendering those claims avoidable under Section 502(d).  *See Firestar III*, 643 B.R. at 551.  The Banks do not address this point; instead, they ask this Court both to recognize their direct rights to payment against FDI and to ignore where those rights come from.  To the extent that the Banks have enforceable obligations against FDI, those claims have been assigned from the Affiliates and are therefore avoidable.  Nothing in *Worthy Lending* or *State Bank of India* suggests that the Banks' claims against FDI are independent of the Affiliates' claims.  Indeed, *State Bank of India* expressly disclaimed the notion that a contract existed between the lender and the seller's account creditor.  *See* slip op. at 1 ("At the outset, it is clear to the Court that there was no contract between these parties, based on both lack of privity between the Bank and these defendants, as well as a total lack of consideration.").

Therefore, the Court concludes, as the Bankruptcy Court did, that the avoidable claims held by the Affiliates and subsequently acquired by the Banks did not result in contractual obligations owed by a party uninvolved in those transactions – here, FDI – to the Banks.

## C.  Proposed Exceptions to Section 502(d) Disallowance

The Banks further argue that Section 502(d) does not apply to claims acquired in good faith before the Chapter 11 petition date.  *See* Appellants' Br. at 16-21.[6]  At the outset, the Court notes that the Banks misstate their argumentative burden.  The onus is not on the Trustee to show that authority exists to "extend[] the language of [Section] 502(d) to

---

[6] On this point, the Court understands the Banks to focus more on the equitable considerations behind the acquisition of their claims – that is, the fact that their claims were acquired pre-petition and in good faith – than from whom, if anyone, they acquired those claims.  Above, the Court has already addressed the Banks' contention that they acquired newly created obligations against FDI rather than preexisting claims transferred from the Affiliates.

disallow" pre-petition claims acquired in good faith. *Id.* at 16. *Firestar II* categorically disallowed transferred claims, holding that "the text of [Section 502(d)] focuses on claims, not claimants, and operates to render a category of claims disallowable – those that belonged to an entity who had received an avoidable transfer." 627 B.R. at 808 (quotation marks and citation omitted). The burden falls on the Banks to establish "pre-petition" and "good faith" exceptions to Section 502(d)'s general rule.

The Banks' proposed exceptions lack support.[7] The Banks' emphasis on their status as "victims who transacted in good faith" does not change the clear meaning of Section 502(d). Appellants' Br. at 17; *see Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." (quotation marks and citation omitted)). Nor does the fact that the Banks acquired the claims pre-petition convert them into direct obligations owed by FDI. *See Firestar III*, 643 B.R. at 547-48 (rejecting the Banks' argument that the pre-petition timing of the transactions cured or converted otherwise disallowable claims). On appeal, the Banks suggest that the logic of *Firestar II* applies only to creditors who acquired their claims

---

[7] The Court disagrees with the Affiliates that the law-of-the-case doctrine forecloses the Banks' argument on this point. The Banks previously argued that claims acquired pre-petition in the ordinary course of business were not "transferred" within the meaning of Section 502(d). Appellants' Main Brief at 17, *Firestar II*, 627 B.R. 804 (S.D.N.Y. 2021) (No. 20-cv-04169 (JGK)), ECF No. 10 ("The Court's unwarranted extension of 502(d) to reach claims that were acquired by good faith purchasers before the Bankruptcy Petition exceeds its authority and casts aside longstanding New York law applying to good faith purchasers."). Yet *Firestar II* held only that "a transferee of a claim is subject to disallowance under Section 502(d) on par with the transferor." 627 B.R. at 808. It did not address whether claims arguably acquired in good faith prior to a debtor's bankruptcy petition are transfers under Section 502(d). *See id.* (noting the Banks' unresolved argument that "they are asserting their own claims against Firestar that they obtained from transactions prior to Firestar's bankruptcy petition"). Therefore, the Court considers the Banks' arguments on the merits. *See also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002) (Sotomayor, J.) (law of the case "is a discretionary doctrine").

in post-petition claims trading and had "voluntarily exposed themselves to a risk that they had the ability to investigate before acquiring the claims." Appellants' Br. at 18 (brackets omitted) (quoting *KB Toys*, 736 F.3d at 255). Yet in focusing on the creditors who acquire bankruptcy claims, the Banks ignore the incentives facing those claimants from whom the claims are acquired. *Firestar II* explained, in the context of post-petition transactions, that "[i]f a transferred claim was protected from disallowance, an original claimant who received an avoidable transfer would have an incentive to sell its claim and 'wash' the claim of any disability." 627 B.R. at 808 (citation omitted). Protecting pre-petition claims would invite the same gamesmanship, changing only how parties structured their transactions to "wash" claims of any risk of disallowance.

Elsewhere, the Banks turn to other sections of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to justify Section 502(d)'s inapplicability to their claims. *See* Appellants' Br. at 19-24. The language of those provisions bears little on the scope of Section 502(d).

Section 553, referenced in Section 502(d), bars a creditor from offsetting a debt owed to a debtor with a claim transferred to the creditor "after the commencement of the case," 11 U.S.C. § 553(a)(2)(A), or "after 90 days before the date of the filing of the petition" while the debtor was insolvent (subject to several exceptions), *id.* § 553(a)(2)(B). According to the Banks, "many courts" have held that Section 553 does not apply to creditors who acquired their claims in good faith before the petition date. Appellants' Br. at 20-21 (citing *Sherman v. First City Bank of Dall.* (*In re United Scis. of Am., Inc.*), 893 F.2d 720 (5th Cir. 1990), and collecting cases). But, aside from being a different statute, Section 533(a)(2) differs from Section 502(d) in several respects. First, courts have far more discretion to determine the application of Section 553 than that of Section 502(d). *See Breeden v. Mfrs. & Traders Tr.*

Co. (*In re Bennett Funding Grp., Inc.*), 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997) ("[T]he right of setoff is within the bankruptcy court's discretion, and it may invoke equity to bend the rules, if required, to avert injustice." (quotation marks and citation omitted)); *Bahr. Islamic Bank, BisB v. Arcapita Bank B.S.C.(C)* (*In re Arcapita Bank B.S.C.(C)*), 640 B.R. 604, 620 (S.D.N.Y. 2022) ("Section 553 of the Bankruptcy Code does not create a creditor's right of setoff, but merely preserves the right if it otherwise exists under applicable non-bankruptcy law.").  Second, Section 553 also bars creditors from offsetting certain debts incurred "for the purpose of obtaining a right of setoff against the debtor."  11 U.S.C. § 553(a)(3)(C).  Although the Banks focus on Section 553(a)(2), Section 553(a)(3) reflects that Congress knew how to target claims obtained in good faith.  Had Congress meant to shield from disallowance tainted claims acquired in good faith, it would have included similar language in Section 502(d).  *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").[8]

The Banks also argue that a transfer made before filing a proof of claim against a bankruptcy estate should be treated differently than a transfer made after filing a proof of

---

[8] In addition to the statutory distinctions, the Banks' reliance on *United Sciences of America* is unpersuasive.  There, the Fifth Circuit held that chargebacks that occurred after the filing of a bankruptcy petition, but which related to transactions that occurred prior to filing, "arose" before the filing for bankruptcy purposes.  893 F.2d at 724 ("Th[e] right to payment, and hence [the debtor's] debt to [the creditor], arose not later than when the charged back item was initially credited to [the debtor's] account, regardless of when the issuing banks actually asserted their chargeback claims.").  In other words, the Fifth Circuit held that Section 553(a)(2) did not apply to the claims at issue; it did not allow the creditor to use those claims to set off a debt despite Section 553's applicability.  The other cases cited by the Banks also do not support the premise that courts can decline to apply otherwise applicable provisions of the Bankruptcy Code to pre-petition claims merely because they were acquired in good faith.

claim.  *See* Appellants' Br. at 22 (citing 11 U.S.C. § 101; 28 U.S.C. § 157).  The Banks do not

explain why it follows from this premise (even if true) that the Court should treat a pre-

petition transfer differently from a post-petition transfer.  To the extent that the Banks argue

that Section 502(d) does not apply to claims transferred before the filing of a proof of claim,

claimants would simply transfer their tainted claims before filing a proof of claim against the

bankruptcy estate.  Such a conclusion clashes with the text of Section 502(d), its purpose, and

the prior holdings in this case.

Finally, the Banks point to the Federal Rules of Bankruptcy Procedure.  *See id.* at 22-

23.  According to the Banks, a claimant who acquires a transferred claim before a proof of

that claim is filed can file that proof of claim as the original creditor under Federal Rule of

Bankruptcy Procedure ("Bankruptcy Rule") 3001(e)(1); by contrast, a claimant who acquires

a transferred claim after that filing must first receive a court order substituting the transferee

for the transferor under Bankruptcy Rule 3001(e)(2), after which it "stands in the shoes of the

transferor."  *Id.*  Based on these rules, the Banks suggest that they are the "holder" of claims

acquired pre-petition and have their own rights.  *Id.* at 24.  Bankruptcy Rule 3001(e),

however, outlines only the procedural requirements for transferred claims and does not

substantively affect the rights of the transferee claimant.  *See* Fed. R. Bankr. P. 3001(e)

advisory committee's note to 1991 amendments ("[Subsection (e) was] amended to limit the

court's role to the adjudication of disputes regarding transfers of claims. . . .  This rule is not

intended either to encourage or discourage postpetition transfers of claims or to affect any

remedies otherwise available under nonbankruptcy law to a transferor or transferee."); *In re*

*Latam Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 4229500, at *8 (Bankr. S.D.N.Y.

Sept. 13, 2022) ("The Bankruptcy Code does not speak to the validity of claim transfers, and

the Bankruptcy Rules provide only procedures for the filing of notice required for a transferee

to be recognized as the holder of the claim." (brackets and citation omitted)).  Where the transferor of a claim has not filed a proof of claim prior to the transfer, Rule 3001(e)(1) states that only the transferee may file a proof of claim.  Where the transferor has filed a proof of claim prior to the transfer, Rule 3001(e)(2) requires the transferee to file evidence of the transfer with the court.  The Banks cannot extract substantive rights as to their claims from the procedure outlined in Bankruptcy Rule 3001(e).

In short, the Court holds that the Banks' claims – even if acquired in good faith and before the bankruptcy petition – are "transfers" within the ambit of Section 502(d) and therefore disallowable.

## CONCLUSION

For the foregoing reasons, the Order of the Bankruptcy Court sustaining the Trustee's objections to the Banks' claims is AFFIRMED in its entirety.  The Clerk of Court is respectfully directed to close the case.

Dated:  May 20, 2024
       New York, New York

                                    SO ORDERED.

                                    JENNIFER L. ROCHON
                                    United States District Judge